

07/17/2012

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: § | | |
| § | | |
| **BRIAN R. PARKER** § | | |
| xxx-xx-0827 § | Case No. 11-41466 | |
| **and DARALYNN JANE PARKER** § | | |
| xxx-xx-7702 § | | |
| 8005 Laughing Waters Trail, McKinney, TX  75070 § | | |
| § | | |
| Debtors § | Chapter 7 | |
| TMS TREASURE COAST, INC. § | | |
| § | | |
| Plaintiff § | | |
| § | | |
| v. § | Adversary No. 11-4136 | |
| § | | |
| BRIAN R. PARKER § | | |
| § | | |
| § | | |
| Defendant § | | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**[1]

Upon trial of the complaint filed by the Plaintiff, TMS Treasure Coast, Inc.

("TMS" or "Plaintiff") seeking a determination of whether an alleged debt owed to it by

the Defendant-Debtor, Brian R. Parker ("Parker" or "Debtor"), is dischargeable, the Court

issues the following findings of fact and conclusions of law.  The Plaintiff contends that

the debt is non-dischargeable as a debt obtained by fraud or by false representations

pursuant to 11 U.S.C. §523(a)(2)(A).  No other ground was asserted in the complaint.

---

[1] These findings of fact and conclusions of law are not designated for publication and shall not considered as precedent, except under the respective doctrines of claim preclusion, issue preclusion, the law of the case or as to other applicable evidentiary doctrines.

After the trial, the Court took the matter under advisement. This decision disposes of all issues pending before the Court.

## **FINDINGS OF FACT**[2]

1. The Plaintiff, TMS Treasure Coast, Inc., is a Florida corporation owned by Richard Stumpf.[3]

2. TMS was originally a corporate vehicle through which Stumpf's spouse rendered nursing services.

3. No stock in TMS was ever formally issued nor were corporate formalities generally followed.

4. The Debtor-Defendant, Brian R. Parker, and his wife, Daralynn Jane Parker, are the sole owners of Aree, Inc., a Florida corporation.[4]

5. Stumpf and Parker were originally introduced around 2004 through Steve Clark, who served as the personal accountant for both of them.

6. At all times relevant to this dispute, Stumpf was employed in a business development role at the General Electric aircraft division now known as the Parker Aerospace Group in Cincinnati, Ohio.

7. At the time that the transaction developed, Parker was a systems-related engineer in Michigan, acting primarily as a software consultant in the development of automation systems to optimize manufacturing processes.

8. At the advice of Steve Clark, Parker had formed Aree, Inc., billed his consulting services through Aree and paid salaries for him and his wife through the company.

---

[2] All stipulated facts were set forth in the approved Joint Pre-Trial Order entered in this adversary proceeding on April 18, 2012. The Court will reference only those facts necessary or germane to a decision on this matter.

[3] ¶ 3 of the Agreed Issues of Fact.

[4] *Id.*

9. Logicair was a company owned and controlled by William Watkins.[5] It was a distributor of components utilized in the automation of manufacturing processes.

10. At all times germane to this dispute, Steve Clark was also the personal accountant for Logicair, Inc. and its owner, William Watkins.

11. Steve Clark had earlier solicited Stumpf as a potential purchaser of Logicair from Watkins. Stumpf thought the proffered purchase price was excessive and declined to pursue the purchase.

12. Clark later solicited Parker with regard to acquiring Logicair, Inc. around Thanksgiving 2006. Parker was intrigued – contemplating that the acquisition of a producer of equipment, or "hardware" in his field could be utilized in a profitable manner to implement software that he created.

13. Late in 2006, Stumpf was informed of Parker's interest in purchasing Logicair by Steve Clark.[6]

14. Stumpf saw the feasibility of the proposed acquisition by Parker because the products produced by Logicair would be "complementary" to Parker's role as a software consultant in the field of logic control development.

15. As Parker obtained due diligence information from Logicair and early drafts of documents from the accountant, Steve Clark, he shared it with Stumpf during the end of 2006 and into 2007 as they contemplated the possibility of jointly acquiring Logicair.[7]

16. Nothing in the communications between the parties reflects any concern by Stumpf or TMS regarding the vehicle or capacity in which Parker would obtain Logicair.

17. The proposed Letter of Intent to Purchase shared with Stumpf by Parker references the intention "of Brian Parker or his assigns" to purchase Logicair.[8] No objection to that document was voiced by Stumpf or TMS.

---

[5] *Id.*

[6] ¶ 3 of the Agreed Issues of Fact.

[7] Defendant's Ex. U through Y.

[8] Defendant's Ex. W.

18. Stumpf's interest in joining with Parker to acquire Logicair through some type of joint business venture waned in the spring of 2007 as Stumpf decided to stay with his employer of 22 years.

19. In April 2007, Parker finalized with William Watkins the structure of the purchase of Watkins' Logicair stock for the price of $675,000. The deal would require a down payment of $100,000, with the balance of $575,000 to be seller-financed by Watkins, with Watkins holding a senior, purchase-money lien on the stock to secure the payment of the promissory note to Watkins.

20. Stumpf subsequently agreed to lend the $100,000 down payment required for "Parker or his assigns" to acquire Logicair. The details of that proposed lending transaction were not immediately clarified between Stumpf and Parker.

21. No representations were made by Parker to Stumpf regarding projected business performance of Logicair in the event that his efforts to acquire that company was successful.

22. Stumpf understood that, in any event, Watkins would have a superior lien position to any held by himself or his company.

23. Neither Stumpf nor Parker were sophisticated businessmen nor did either of them have experience in the documentation of secured lending transactions.

24. While awaiting the document preparation and closing of the Logicair sale, Parker and Stumpf met on June 4, 2007 to finalize the financing of the down payment.

25. It was at the June 4 meeting that Stumpf presented Parker with the promissory note form under which the loan would be tendered to Aree, Inc. and not to Parker in an individual capacity. That issue had not been previously discussed by the parties.

26. Parker personally provided the consulting services that were billed under the corporate moniker of Aree, Inc.

27. On June 4, 2007, a Promissory Note with Equity Ownership Conversion (the "Note")[9] was executed by Parker on behalf of Aree, Inc. (with no capacity specified) in favor of TMS in the amount of $100,000.[10]

---

[9] Plaintiff's Ex. 1.

[10] ¶ 4 of the Agreed Issues of Fact.

28. The Note expressly stated that "Debtor (Aree) will use Promissory Note funds toward the initial payment in the acquisition of (sic) ongoing Florida Business Entity known as Logic Air (sic) Incorporated."[11]

29. The Note further granted TMS an option to convert repayment of the Note into an agreed upon 20% equity ownership in Logicair and a security interest in Logicair and its assets.[12]

30. Aree expressly warranted to TMS that "Business [Logicair] is being acquired with the proceeds of the Note [and] proceeds may be disbursed by [TMS] directly to the seller of such Business."[13]

31. Aree further warranted that "Debtor [Aree] has, or immediately will acquire, full title to Business and shall at all times keep Business free of all liens and claims whatsoever, other than the security interest under this note and agreement, and an acknowledged separate purchase and payment agreement with Business founder."[14]

32. Three days later, on June 7, 2007, pursuant to the Note, and in reliance upon the representations and warranties contained therein, TMS sent a cashier's check to William Watkins [owner of Logicair] for $100,000 to [partially] fund Aree's purchase of the Logicair stock.[15]

33. Notwithstanding the stipulation that TMS sent the cashier's check, the check was actually drawn from the personal funds of Richard Stumpf and were delivered to William Watkins prior to the closing by Stumpf's spouse.[16]

34. According to Stumpf, the funds were not funneled through TMS "for the sake of time."

---

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] ¶ 5 of the Agreed Issues of Fact.

[16] Defendant's Ex. B.

35. It was the intention of the parties to provide TMS with a lien upon the acquired assets, subordinate to the first lien position of the seller, William Watkins.

36. However, neither Stumpf nor Parker knew anything about the procedures necessary to perfect a security interest to be held by TMS or Stumpf.

37. Stumpf never dictated, requested, nor did he ever see, the documentation that was to be utilized in the stock sale.

38. No UCC-1 necessary to perfect any security interest in Logicair assets for the benefit of TMS was prepared by Stumpf nor executed by Parker or Aree.

39. No provision was made for the tendering of any Logicair stock acquired by Parker to TMS in order that TMS might perfect by possession any security interest it held in such stock.[17]

40. Stumpf did not attend the closing of the Logicair stock purchase because he was attending to business duties out-of-town.

41. Parker had objected to a number of items in the proposed transaction but, between June 4 and June 7, 2007, he had not been given any of the finalized documentation proposed to be utilized in the stock sale.

42. Steve Clark, as the accountant for every party in this transaction, provided the documentation for the sale, without objection from either Stumpf or Parker.

43. The finalized documentation provided by Clark, including the Share Purchase Agreement,[18] outlined a sale of the stock to Parker in his individual capacity rather than to Aree, Inc.[19]

44. Parker saw the finalized documentation for the first time en route to the closing.

45. No attorney ever reviewed the proposed documentation for Parker's benefit.

---

[17] *See* FLA. STAT. ANN. §679.3131(1) (West 2010).

[18] Plaintiff's Ex. 3.

[19] ¶ 5 of the Agreed Issues of Fact.

46. The finalized documentation, as prepared by Clark, was backdated to June 1, 2007 for unexplained "tax purposes" that Parker neither understood nor questioned.

47. Parker issued no objection to the stock purchase in his individual name, rather than in the corporate name of Aree, Inc., because he did not subjectively believe that it made any substantive difference, notwithstanding the language of the promissory note with TMS.

48. In addition to the Share Purchase Agreement, Parker individually signed a promissory note to Watkins for $575,000, a Mortgage and Security Agreement conveying to Watkins a first lien security interest in all of the stock and the assets of Logicair to secure the payment of that note, and an Employment Agreement for the post-closing employment of Watkins by Logicair which, strangely enough, was executed by Logicair by Watkins, as the purported president of Logicair, and not by Parker as the new owner of Logicair.[20]

49. Notwithstanding the expectation of Parker that Watkins would be leaving the business upon the stock sale, Watkins never actually relinquished managerial control of Logicair.

50. Parker never actually obtained possession of the Logicair stock from Watkins.

51. Managerial control of Logicair was retained by Watkins after the closing.

52. Neither TMS nor Stumpf demanded any action be taken in the post-closing period to correct the supposedly wrongful acquisition of Logicair in Parker's personal capacity.

53. Stumpf and Parker continued to have a harmonious relationship in the months after the sale of Logicair to Parker, notwithstanding the purported fraud.[21]

54. The activities of Aree, Inc. were effectively merged into Logicair, given that all of Parker's time, effort and energy were devoted to that entity in the post-closing period.

55. Logicair quickly encountered financial trouble after the closing, notwithstanding efforts by Parker to procure new sales opportunities.

---

[20] Plaintiff's Ex. 3.

[21] *See, e.g.*, Defendant's Ex. Z, AA and BB.

56. After approximately one year, during which he procured little income from Logicair, Parker was forced by pressing financial concerns to abandon his interest in Logicair and to move to Texas to obtain employment.

57. TMS never received any payments under the Note and, in June 2008, TMS notified Parker and Aree of defaults under the Note.[22]

58. On June 8, 2009, TMS sued Aree, Inc. and Parker in state court in Florida, in a case styled *TMS Treasure Coast, Inc. v. Aree, Inc., et. al.*, in the Circuit Court of the Nineteenth Judicial Circuit of Martin County, Florida.

59. On May 5, 2011, Parker filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code in this Court under bankruptcy case no. 11-41466 – staying the prosecution of the lawsuit against him in his individual capacity prior to the entry of any judgment.[23]

60. The Plaintiff has failed to demonstrate by a preponderance of the evidence that any debt owed to it by Parker was procured under circumstances constituting actual fraud.

61. The Plaintiff has failed to demonstrate by a preponderance of the evidence that any debt owed to it by Parker was procured through a false representation.

62. The Plaintiff has failed to demonstrate by a preponderance of the evidence that any stated intention by the Defendant to procure Logicair through the auspices of Aree, Inc. was given with the intention and purpose of deceiving the Plaintiff.

63. Both the Plaintiff and the Defendant mistakenly trusted Steve Clark to protect their respective interests in the Logicair sales transaction when, by all indications, Clark was primarily interested in promoting the best interests of Watkins, the seller, in the transaction.

64. Both the Plaintiff and the Defendant mistakenly failed to take appropriate steps, including the failure to procure independent professional assistance, to protect their respective interests in the Logicair sales transaction.

---

[22] ¶ 7 of the Agreed Issues of Fact.

[23] ¶ 8 of the Agreed Issues of Fact.

65. The most nefarious deduction regarding the Defendant's conduct which can legitimately be derived from the evidence presented is that the Defendant breached an obligation under the Note when he failed to procure the Logicair stock in the name of Aree, Inc.

66. The inexperience of the Plaintiff (and its principal, Stumpf) in the documentation of secured lending transactions, its failure to overcome that inexperience by the procurement of professional advice and assistance, and its erroneous reliance upon Steve Clark to provide such assistance played significant roles in the loss sustained by the Plaintiff.

67. While those factors, and the significant financial loss occasioned thereby, place the Plaintiff in a sympathetic light, such sympathy cannot be permitted to stand in lieu of the required degree of proper proof pertaining to the Defendant's conduct and intentions under these circumstances, particularly in light of the Bankruptcy Code's directive that exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor.

68. To the extent any of these findings of fact constitute conclusions of law, the Court expressly adopts them as such.

## CONCLUSIONS OF LAW

1. This Court has subject matter jurisdiction under 28 U.S.C. §§1334 and 11 U.S.C. §523. This Court has personal jurisdiction over the parties to this adversary proceeding.

2. This Court has the authority to enter a final judgment in this adversary proceeding since it constitutes a core proceeding under 28 U.S.C. §157(b)(2)(I) and (O).

3. The Plaintiff's Complaint seeks a determination that the debt which it alleges is owed to it should be excepted from discharge under §523(a)(2)(A) as a debt obtained by false pretenses, a false representation or actual fraud.

4. In seeking such an exception to the Debtor's discharge, the Plaintiff assumes the burden of proof under a preponderance of the evidence standard. *Grogan v. Garner*, 498 U.S. 279, 286 (1991).

5. All exceptions to discharge under §523 "must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be

afforded a fresh start."[24] *In re Hudson*, 107 F.3d 355, 356 (5th Cir. 1997).

6. However, the Fifth Circuit has noted that there are limits to the maxim that exceptions to dischargeability are to be construed narrowly in favor of the debtor, particularly in situations falling under an exception to dischargeability in a case in which a debtor has committed fraud. *See generally Deodati v. M.M. Winkler & Associates (In the Matter of: M.M. Winkler & Associates),* 239 F.3d 746, 751 (5th Cir. 2001).

*Failure to Assert Theory of Liability*

7. Parker contends as an initial matter that judgment must be rendered in his favor (or that the complaint must be dismissed) because TMS has pled only non-dischargeability grounds and has necessarily failed to plead the existence of a cause of action or a theory of liability necessary to establish a "debt" that could thereafter be rendered non-dischargeable.

8. Such a position elevates form over substance and ignores the liberal pleading rules recognized under federal practice.

9. In federal practice, "a pleading ... need not specify in exact detail every possible theory of recovery – it must only give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Thrift v. Estate of Hubbard*, 44 F.3d 348, 356 (5th Cir.1995) (*quoting Conley v. Gibson*, 355 U.S. 41, 47(1957)) (internal quotations omitted).

10. Thus, "[t]he notice pleading requirements of Federal Rule of Civil Procedure 8 and case law do not require an inordinate amount of detail or precision." *Cooper Indus., LLC v. American Intern. Specialty Lines Ins. Co.,* 273 Fed. Appx. 297, 307 (5th Cir. 2008) (*citing St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 434 (5th Cir.2000)).

11. Here, the Complaint clearly asserts the existence of a debt even if there is no designated count that specifies a particular state law cause of action for its recovery. The Complaint gives the Defendant fair notice of the plaintiff's claim and sets forth facts upon which relief can be granted.

---

[24] However, a fresh start is not promised to all who file for bankruptcy relief, but only to "the honest but unfortunate debtor." *Grogan*, 498 U.S. at 286-87.

12. Accordingly, the Complaint is sufficient "even if it fails to categorize correctly the legal theory giving rise to the claim." *Cooper Indus.,* 273 Fed. Appx. at 307, (*quoting Dussouy v. Gulf Coast Inv. Corp*., 660 F.2d 594, 604 (5th Cir.1981)). The Defendant's contentions based upon that rationale are overruled.

*Nondischargeability Under 523(a)(2)(A): Debt Arising by Fraud, False Pretenses, or False Representation*

13. 11 U.S.C. §523(a)(2)(A) of the Bankruptcy Code provides that:

> a discharge under §727 of this title does not discharge an individual debtor from any debt for money, property, or services, ... to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

14. Section 523(a)(2)(A) encompasses similar but distinct causes of action. Though other circuits have applied a uniform standard to all § 523(a)(2)(A) actions,[25] the Fifth Circuit has distinguished the elements of "actual fraud" and of "false pretenses and false representations." *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1291 (5th Cir. 1995).

15. The distinction recognized by the Fifth Circuit appears to be a chronological one, resting upon whether a debtor's representation is made with reference to a future event, as opposed to a representation regarding a past or existing fact. *Bank of La. v. Bercier (In re Bercier)*, 934 F.2d 689, 692 (5th Cir.1991) [A debtor's promise ...

---

[25] *See, e.g., Britton v. Price (In re Britton)*, 950 F.2d 602, 604 (9th Cir. 1991); *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1287 (8th Cir. 1987). Though some bankruptcy courts outside of the Fifth Circuit have cited the decision of the United States Supreme Court in *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351(1995), in support of their proposition that all of the §523(a)(2)(A) actions are governed by the elements for actual fraud, *see, e.g., AT&T Universal Card Services v. Ellingsworth (In re Ellingsworth)*, 212 B.R. 326 (Bankr. W.D. Mo. 1997); *AT& T Universal Card Services v. Alvi (In re Alvi),* 191 B.R. 724 (Bankr. N.D. Ill. 1996); the Supreme Court in that case was actually distinguishing the language used in §523(a)(2)(A) from that utilized in §523(a)(2)(B) in order to determine the degree of reliance necessary above mere reliance in fact in order to exempt a debt from discharge under (a)(2)(A). Since the Supreme Court specifically refused to even apply their direct holding regarding the degree of reliance in actual fraud cases to cases of false pretense or false representation, 116 S.Ct. at 443, n. 8, the statement that the Court erased all distinctions between the three (a)(2)(A) actions strains credibility.

related to a future action which does not purport to depict current or past fact ... therefore cannot be defined as a false representation or a false pretense].[26]

16. Because any representation by Parker arising from the execution of the Note regarding the purchase of Logicair by Aree, Inc. pertained to a future event, any such statement cannot be properly characterized as a false representation or a false pretense in this Circuit.

17. Thus, the validity of the Plaintiff's claim in this case rests upon sufficient proof that the debt was obtained by actual fraud.

18. To have a debt excepted from discharge pursuant to the "actual fraud" provision in § 523(a)(2)(A), an objecting creditor must prove that:
    (1) the debtor made representations;
    (2) at the time they were made the debtor knew they were false;
    (3) the debtor made the representations with the intention and purpose to deceive the creditor;
    (4) the creditor justifiably relied on such representation; and
    (5) the creditor sustained losses as a proximate result of the representations.

*Pentecost*, 44 F.3d at 1293, *as modified by the United States Supreme Court decision of Field v. Mans*, 516 U.S. 59 (1995) [regarding the proper standard of reliance].

19. Because the Court concludes that the Plaintiff has failed to prove its cause of action for actual fraud by a preponderance of the evidence, judgment must be rendered for the Debtor-Defendant in this action.

20. To the extent any of these conclusions of law constitute findings of fact, the Court expressly adopts them as such.

---

[26] While "false pretenses" and "false representation" both involve intentional conduct intended to create and foster a false impression, the distinction is that a false representation involves an express statement, while a claim of false pretenses may be premised on misleading conduct without an explicit statement. *See Walker v. Davis (In re Davis)*, 377 B.R. 827, 834 (Bankr. E.D. Tex. 2007); and *Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 760 (Bankr. E.D. Tenn. 2003). In order for a debtor's representation to constitute a false pretense or a false representation, it "must have been: (1) [a] knowing and fraudulent falsehood, (2) describing past or current facts, (3) that [was] relied upon by the other party." *In re Allison*, 960 F.2d at 483; *see also In re Bercier*, 934 F.2d at 692 ["to be a false representation or false pretense under § 523(a)(2), the false representations and false pretenses must encompass statements that falsely purport to depict current or past facts"].

21.  An appropriate judgment shall be entered consistent with these findings and conclusions.

Signed on 07/17/2012

THE HONORABLE BILL PARKER
UNITED STATES BANKRUPTCY JUDGE